AO 91 (REV.5/85) Criminal Complaint

AUSA Andrew DeVooght (312) 353-5159

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

UNITED STATES OF AMERICA

v.

CHRISTOPHER WILLIAMS,
also known as "Big C"

**CRIMINAL COMPLAINT**

CASE NUMBER: MAGISTRATE JUDGE FINNEGAN

**UNDER SEAL**   13CR  0272

I, the undersigned complainant, being duly sworn on oath, state that the following is true and correct to the best of my knowledge and belief:  On or about October 27, 2011, at Chicago, in the Northern District of Illinois, Eastern Division, and elsewhere,  CHRISTOPHER  WILLIAMS, also known as "Big C," defendant herein:

> did knowingly and intentionally distribute a controlled substance, namely, 28 grams or more of a mixture and substance containing a detectable amount of cocaine base, a Schedule II Controlled Substance;

in violation of Title 21, United States Code, Section 841(a).

I further state that I am a Special Agent with the Federal Bureau of Investigation, and that this complaint is based on the facts contained in the Affidavit which is attached hereto and incorporated herein.

Signature of Complainant
Stephen Cupp
Special Agent, Federal Bureau of Investigation

Sworn to before me and subscribed in my presence,

April 3, 2013
Date

at

Chicago, Illinois
City and State

Sheila Finnegan, U.S. Magistrate Judge
Name & Title of Judicial Officer

Signature of Judicial Officer

FILED
4-3-2013
APR X 3 2013
THOMAS G. BRUTON
CLERK, U.S. DISTRICT COURT

UNITED STATES DISTRICT COURT    )
                                 )     ss
NORTHERN DISTRICT OF ILLINOIS    )

## AFFIDAVIT

I, STEPHEN CUPP, being duly sworn, state as follows:

1.    I am a Special Agent with the Federal Bureau of Investigation, and have been so employed since 2007. My current responsibilities include the investigation of narcotics trafficking offenses. I have received specialized training in the enforcement of federal narcotics laws, and have been involved in numerous aspects of narcotics trafficking investigations, including: (a) the debriefing of defendants, witnesses, informants, as well as others who have knowledge of the distribution and transportation of controlled substances; (b) surveillance; and (c) analysis of documentary and physical evidence.

2.    This affidavit is based on my personal knowledge, information provided to me by other law enforcement agents, information provided by a cooperating witness, review of consensual recordings, physical surveillance, my training and experience, as well as the training and experience of other law enforcement agents.

3.    This investigation included the use of consensually recorded telephone calls and audio/video recorded meetings. The summaries of recorded conversations in this affidavit do not include reference to all of the topics covered during the conversations. Further, quoted material from the recorded conversations as set out in this affidavit is taken from draft summaries, not final transcripts. In addition, the summaries do not include references to all statements made by the speakers on the

1

topics that are described by the speakers. In many of the paragraphs describing calls set forth below, interpretations of the discussion are included in brackets. These interpretations include meanings attributed to code words, coded language, or vague references used by the speakers. My understanding and interpretation of the conversations is based upon the contents of the conversations, information provided by the cooperating witness, the context of both prior and subsequent intercepted conversations, my knowledge derived from this investigation, and my experience and familiarity, and the experience and familiarity of other law enforcement agents, with narcotics trafficking organizations.

4. This affidavit is submitted in support of a criminal complaint alleging that CHRISTOPHER WILLIAMS, also known as Big C, has violated Title 21, United States Code, Section 841(a). Because this affidavit is being submitted for the limited purpose of establishing probable cause in support of a criminal complaint charging WILLIAMS with distributing cocaine base, I have not included each and every fact known to me concerning this investigation. I have set forth only the facts that I believe are necessary to establish probable cause to believe that the defendant committed the offense alleged in the complaint.

## FACTS SUPPORTING PROBABLE CAUSE

### I. Background

5. This investigation has included the court authorized interception of wire communications over (708) 674-6657 ("Target Phone 2"), (773) 640-4259 ("Target Phone 3"), (708) 305-6984 ("Target Phone 4"), and (708) 200-5494 ("Target Phone 5").

Each of these phone was used by Walter Blackman.[1] Interception of wire communications over Target Phone 2 occurred from October 16, 2012, to October 30, 2012, and from November 21, 2012 to December 21, 2012. Interception of wire communications over Target Phone 3 occurred from October 16, 2012, to November 14, 2012, and from November 21, 2012 to December 31, 2012. Interception of wire communications over Target Phone 4 and Target Phone 5 occurred from November 20, 2012 to January 19, 2013.

6.    A confidential witness ("CW-2") has identified an unmarked photograph of Blackman as "Gangster," which law enforcement knows to be Blackman's nickname.[2] According to CW-2, Blackman is a high-ranking member of the Black Disciples street gang in Chicago who distributes drugs, including cocaine and heroin, in the Chicago area and elsewhere. According to a Chicago Police Department arrest report from July 2010, Blackman identified himself as a member of the Black Disciples.

7.    According to CW-2, WILLIAMS, whom CW-2 also knows as "Big C" or "Chris," is a member of the Black Disciples street gang. Chicago Police Department

---

[1] Blackman is being charged in a separate criminal complaint, which charges him with multiple drug violations.

[2] CW-2 is a self-reported former member of the Gangster Disciples who has previous felony convictions for murder as well as conspiracy to commit murder. To date, a total of approximately $103,100 has been paid to CW-2 as payment for both expenses and services in this investigation and others. CW-2's former street gang, the Gangster Disciples, are rivals of Blackman's street gang, the Black Disciples. Much of the information CW-2 has provided has been independently corroborated by physical surveillance, information from other sources, telephone records, pen register data, court-authorized wiretaps, and other investigative techniques. Therefore, I believe CW-2 to be reliable.

3

arrest reports from April 29, 2007 and November 3, 2007 also reflect that WILLIAMS

is a self-identified member of the Black Disciples street gang. CW-2 also knows

WILLIAMS to be a member of a narcotics distribution crew run by Walter Blackman,

also known as "Gangster."[3] For instance, as further described in this affidavit, at FBI's

direction, CW-2 made a controlled purchase of approximately 62 grams of crack cocaine

from WILLIAMS on October 27, 2011. Additionally, CW-2 made a controlled purchase

of approximately 122 grams of crack cocaine from WILLIAMS on January 18, 2012,

during which WILLIAMS cooked powder cocaine into crack cocaine.

## II.     October 27, 2011 Purchase of 62 Grams of Crack Cocaine

8.     On October 14, 2011, at approximately 8:30 p.m., CW-2 had a

consensually recorded telephone conversation with WILLIAMS, who was using

telephone number 773-297-6987 ("WILLIAMS Phone").[4] During the conversation, CW-

2 and WILLIAMS arranged to conduct a future crack cocaine transaction. Specifically,

---

[3] Blackman is being charged in a separate criminal complaint, which charges him with multiple drug violations.

[4] CW-2 provided WILLIAMS Phone as a telephone number CW-2 had for WILLIAMS. The identification of WILLIAMS and his voice in this affidavit is based in part on the following: CW-2 identified the person he/she spoke to on the consensually recorded telephone calls as "Big-C," or "Chris," and identified an unmarked photograph of WILLIAMS as "Big C " or "Chris"; the voicemail greeting for WILLIAMS Phone was, "You know it's me Big C, Big C. You know it's me. Hit me back. Call me back. I'll pick up"; and, as described below, following consensually recorded telephone calls in which CW-2 and WILLIAMS agreed to meet to conduct a crack cocaine transaction, surveillance identified WILLIAMS, based on his unmarked Chicago Police Department photograph, as the person who met CW-2 to conduct these transactions.

CW-2 said, "Probably try to get up which you Tuesday, man. Go down 63rd street. You know." WILLIAMS responded, "Ok, I gotch you." CW-2 then asked, "Hey what's the address [price for 63 grams of crack cocaine]?" WILLIAMS responded, "For 63rd and Halsted [63 grams of crack cocaine]?" CW-2 replied, "Yeah . . . 'Cause it's kind of steep right now." CW-2 further stated, "I'm sayin', what is it [the price for the 63 grams of crack cocaine]?" WILLIAMS asked, "On the softball [powder cocaine] or the hard [crack cocaine]?" CW-2 answered, "Hard [crack cocaine]." WILLIAMS explained, "On the hard, I ain't even going to lie. Mother fucker want three [$3,000 for the 63 grams of crack cocaine]." CW-2 responded, "Ooo Charlie, for real?" WILLIAMS replied, "Yeah. It's fucked up out here [cocaine was hard to obtain]." CW-2 agreed, "It is, I know. 'Cause there ain't shit [cocaine] out here worth nothing." WILLIAMS explained, "But it's [cocaine] coming back." CW-2 asked, "Is it decent though?" WILLIAMS answered, "Yeah, it's coming back right [the quality of the crack cocaine wais good]." CW-2 responded, "Alrigh' coo' coo'. I get which you tomorrow."

9. On October 24, 2011, at approximately 11:10 a.m., CW-2 had a consensually recorded telephone conversation with WILLIAMS, who was using WILLIAMS Phone. During the conversation, CW-2 arranged to meet WILLIAMS later to conduct a crack cocaine transaction. CW-2 asked, "What's cookin', man?" WILLIAMS answered, "Everythin' still straight." CW-2 later stated, "Halsted [crack cocaine], you know." WILLIAMS responded, "The Halsted." CW-2 confirmed, "Yeah." CW-2 then told WILLIAMS to hold on and answered an incoming call. CW-2 returned to the call and WILLIAMS continued, "Alrigh.' I'm gonna see if I can get you the,

5

umm, I'm going to hollar at Gangster [Blackman] and see if I can get you a lower price. I got it [crack cocaine] but you know, but it's fo' shit." CW-2 responded, "I just got done talkin' to him [Blackman]. That's who hung up on me. That was him [Blackman] who just hung up on me, when I clicked over." WILLIAMS replied, "Yeah, yeah." CW-2 stated, "Hey. . . see what you can do though." WILLIAMS agreed, "Alrigh'."

10.    On October 26, 2011, at approximately 11:24 a.m., CW-2 had a consensually recorded telephone conversation with WILLIAMS, who was using WILLIAMS Phone. During the conversation, CW-2 explained, "I'm trying to man, think I'm going on 63rd street man [trying to buy 63 grams of crack cocaine]." WILLIAMS responded, "Oh, you fittin to go on 63rd right now?" CW-2 replied, "yeah." WILLIAMS further stated, "I know what you talking about, I know what you talking about." WILLIAMS then asked CW-2, "You ever find out the ticket on 63rd [the price of 63 grams of crack cocaine]?" CW-2 responded, "No, that's why I'm hitting you up, my guy's out of town." WILLIAMS replied, "Oh, you need to on 63rd." CW-2 answered, "Right." WILLIAMS then explained, "You need to on 63rd, you know I go through Gangster [Blackman]." CW-2 responded, "Ok, I'm saying though shit, if I got to go through you to get to him whatever, you know what I'm saying, you can get, you know what I'm saying." WILLIAMS replied, "Oh, you don't, you don't, you can't go straight to Gangster [Blackman]?" CW-2 answered, "Yeah, but I ain't never went to him like that you know what I'm saying." WILLIAMS agreed to call Blackman, "I'm fittin to go out, I'm fittin to call him." CW-2 asked WILLIAMS, "Let me know what you talking about, you know what the ticket is [the price of 63 grams of crack cocaine]. I gonna do

6

this tomorrow." WILLIAMS agreed, "Aight, I'm gonna call him." CW-2 then sought to confirm with WILLIAMS, "That's the H, right? Hard [crack cocaine]?" WILLIAMS responded, "No, soft [powder cocaine]." CW-2 then asked, "He [Blackman] ain't got no hard?" WILLIAMS explained, "Yeah, he got hard, but I go through soft." CW-2 explained, "No, I want the hard . . . know what I'm saying?" WILLIAMS responded, "Yeah."

11.    On October 26, 2011, at approximately 1:58 p.m., CW-2 had a consensually recorded telephone conversation with WILLIAMS, who was using WILLIAMS Phone. During the conversation, CW-2 told WILLIAMS, "Hey, just tell him [Blackman] make that two of them, man [two 63 gram quantities of crack cocaine]." WILLIAMS responded, "Aight." CW-2 replied, "Aight, grab two of them, you know what I'm talking about?" WILLIAMS answered, "Aight, so he gonna do everything at once tomorrow?" CW-2 responded, "Yeah, yeah, that's uh, what was that numbers again on that if I be writing it [how much would 63 grams of crack cocaine cost]?" WILLIAMS replied "2150." CW-2 then stated, "Ok, so that's $4300 [for two 63-gram quantities of crack cocaine]." CW-2 then explained, "Do it tomorrow, I hit you up man about noon time, I meetcha at noon time. Tell you where we gonna meet at. Gonna get it out the way." WILLIAMS responded, "Ok, for sure." CW-2 then commented, "I hope this shit butter [good quality crack cocaine]." WILLIAMS responded, "Oh yeah, B [Blackman] always got butter . . . that's why I'd be skeptical to fuck with other people."

7

12.     The next day, October 27, 2011, at approximately 11:14 a.m., CW-2 met with law enforcement agents at a pre-determined location to prepare for the crack cocaine transaction with WILLIAMS.  At that time, law enforcement agents searched both CW-2 and CW-2's car for money, weapons and contraband, and found none.  Law enforcement agents then provided CW-2 with $5,500 in FBI funds to purchase crack cocaine from WILLIAMS.

13.     At approximately 11:32 a.m., CW-2 had a consensually monitored telephone conversation with WILLIAMS, who was using WILLIAMS Phone. CW-2 told WILLIAMS to come to CW-2's location in the vicinity of West 119th Street and South Marshfield Avenue in Chicago.   At approximately 11:34, CW-2 had another consensually monitored telephone conversation with WILLIAMS, who was using WILLIAMS Phone.  CW-2 asked WILLIAMS if WILLIAMS had "two 63s" [two 63-gram quantities of crack cocaine].  WILLIAMS told CW-2 that WILLIAMS only had one 63 and that he would bring the second 63 if he was able to obtain it.  At approximately 11:59 a.m., CW-2 had an additional  consensually monitored telephone conversation with WILLIAMS.  WILLIAMS told CW-2 that WILLIAMS' van was in the shop getting painted.  WILLIAMS explained that he would try to borrow a car or get a ride from someone else to the parking lot located at West 119th Street and South Marshfield Avenue in Chicago.

14.     At approximately 12:25 p.m., agents installed an audio transmitting device on CW-2's person and installed an audio and video recording device in CW-2's car.  CW-2 departed the pre-determined location and agents initiated surveillance.

8

15.     At approximately 12:33 p.m., law enforcement agents conducting surveillance ("surveillance") observed CW-2 arrive at and park his/her car in a Marshalls retail store parking lot located at approximately 11620 S. Marshfield Avenue.

16.     At approximately 1:43 p.m. surveillance observed a blue/green Ford Crown Victoria sedan bearing Indiana license plate number 34513B arrive in the parking lot and park next to CW-2's car. WILLIAMS got out of the drivers' seat of the Crown Victoria, popped the car's hood and appeared to pretend to check the car's oil. At approximately 1:45 p.m., surveillance saw WILLIAMS get into the front passenger seat of CW-2's car.

17.     As captured by the recording equipment agents installed in CW-2's car and on CW's person, when WILLIAMS entered CW-2's car, CW-2 began counting a portion of the buy funds agents provided to CW-2 to purchase crack cocaine from WILLIAMS. As WILLIAMS watched CW-2 count the money, WILLIAMS stated, "You want me to count the rest for you, what you counting to, oh damn, that's for all of it [126 grams of crack cocaine]. . . I only got 63rd [63 grams of crack cocaine]." CW-2 counted out $2150 fo the 63 grams of crack cocaine and handed it to WILLIAMS, stating, "2150, player." WILLIAMS counted the money CW-2 handed WILLIAMS. WILLIAMS then distributed to CW-2 a clear plastic bag with a substance in it. CW-2 took possession of the plastic bag and placed it in the console compartment between the driver's seat and the front passenger seat of CW-2's car. Thereafter, at approximately

9

1:46 p.m., surveillance saw WILLIAMS get out of CW-2's car, get back into the Crown Victoria WILLIAMS drove to the parking lot, and drive out of the parking lot.

18.     After CW-2 completed the crack cocaine transaction with WILLIAMS, CW-2 drove to a pre-determined location to meet with agents.  Agents recovered the recording devices installed in CW-2's car and on CW-2's person.  Agents also recovered a clear plastic bag containing an off-white, solid substance that WILLIAMS distributed to CW-2.  The substance WILLIAMS provided to CW-2 was sent to the Drug Enforcement Administration North Central Laboratory ("DEA Lab"), which determined that the substance weighed 62.6 grams and tested positive for cocaine base.

19.     Agents also recovered the remaining funds they had provided to CW-2 to purchase crack cocaine from WILLIAMS.[5]  Agents also once again searched CW-2 and CW-2's car for money, weapons or contraband, and found none.

III.    **January 18, 2012 Purchase of 122 Grams of Crack cocaine**

20.     On January 11, 2012, at approximately 7:04 p.m., CW-2 had a consensually recorded conversation with WILLIAMS, who was using WILLIAMS Phone.  During the conversation, CW-2 explained, "I need to go down 63rd street tomorrow [purchase 63 grams of crack cocaine].  What's the business?"  WILLIAMS asked, "Fo' sho', fo' sho'?"  CW-2 answered, "Fo' sho', fo' sho'."  WILLIAMS said, "You know prices kind of fucked up right now."  CW-2 said, "Man, hollar at a brother.

---

[5] Law enforcement agents recovered $3150 from CW-2.  In addition to giving WILLIAMS $2150 of the $5500 for the crack cocaine, CW-2, with law enforcement agents' knowledge, gave Individual A the remaining $200.

What's up?" WILLIAMS explained, "They [Blackman] talking about twenty-three fifty [$2,350]. They [Blackman] talking about twenty-three fifty [$2,350 for 63 grams of crack cocaine]." CW-2 responded, "No, . . . double up [CW-2 requested two 63-gram quantities of crack cocaine] . . . I mean I gotta keep my spots open [CW-2's purported drug spots]. You know what I'm sayin'." WILLIAMS replied, "Right." CW-2 asked, "Ok, what we talkin' about [for the price of two 63-gram quantities of crack cocaine]?" WILLIAMS stated, "I swear to God. It's, it's hard to get it [crack cocaine]. A four and a hit [over four ounces of crack cocaine]? . . . You talkin' about four and a hit?" CW-2 answered, "Yeah." WILLIAMS said, "I'm baggin' it right now 'cause it's fucked up. A four and a hit, I give it to you for forty-six even [$4,600 for over four ounce of crack cocaine]."[6] CW-2 asked, "Ok. Ok, is this comin' from Ol' Boy [Blackman]." WILLIAMS answered, "You talkin' about Gangster [Blackman]?" CW-2 said, "Yeah." WILLIAMS explained, "No. Gangster's down right now [Blackman did not have crack cocaine] . . . . So I had to go through my cousin . . . That's why it's [the price] so fucked up." CW-2 asked, "Is it [the quality of the crack cocaine] good?" WILLIAMS answered, "Yeah, yeah, yeah." CW-2 replied, "Alrigh' hit me up tomorrow, afternoon time. We make it do what it do." WILLIAMS agreed, "Aight."

21.    On January 16, 2012, at approximately 6:37 p.m., CW-2 had a consensually recorded conversation with WILLIAMS, who was using WILLIAMS Phone. During the conversation, CW-2 asked, "Ready to make that tomorrow?"

---

[6] Two 63-gram quantities of crack cocaine is equivalent to over four ounces of crack cocaine as each ounce is comprised of approximately 28.35 grams.

WILLIAMS asked in response, "Is it fo' sho' [Was CW-2 sure the crack cocaine transaction would occur]." CW-2 responded, "Yeah. I'm for sho'. I'm gonna do this around eleven o'clock. Because I got to pickup some more shit. I got to run to Indianapolis tomorrow." WILLIAMS asked, "Whatch you need?" CW-2 answered by asking, "Uh . . . what them 63rd streets going [what is the price of a 63-gram quantity of crack cocaine]?" WILLIAMS clarified, "63rd?" CW-2 confirmed and asked, "Yeah. What they hittin' fo' [what was the price]? I ain't got, I ain't got that much money now." WILLIAMS answered, "Twenty-two, fifty [$2,250]." CW-2 replied, "Give me, uh, two of them [Two 63-gram quantities of crack cocaine]." WILLIAMS asked, "Two of them?" CW-2 answered, "Yeah." WILLIAMS replied, "Aight. That's forty-five [$4,500]." CW-2 stated, "Ok. Be ready the morning...'bout eleven [11:00 a.m.] you know." WILLIAMS asked, "Both of them hard [crack cocaine] right?" CW-2 answered, "Yeah, yeah. Both hard." WILLIAMS replied, "Alrigh'." CW-2 continued, "Then uh, shit uh, you gonna have to hollar at dude [Blackman], uh, Gangster [Blackman]?" WILLIAMS explained, "No I'm finnin to call him now 'cause, the way . . . he [Blackman] workin' out of, I don't know if he personally want to get the money first or what. 'Cause I only got one 63rd [63-gram quantity of crack cocaine] on me. So tomorrow I gotta call him and see when he [Blackman] want that [the money for a second 63-gram quantity of crack cocaine]. And then I know that's [the 63-gram quantity of crack cocaine WILLIAMS had] gonna be gone by tonight." CW-2 responded, "Right . . . After this here, like Friday, I want to get that nine piece dinner [9 ounces

12

of crack cocaine], you know what I mean." WILLIAMS replied, "Oh yeah, all day . . . . But it's here, it's here."

22. On January 17, 2012, at approximately 2:20 p.m., CW-2 had a consensually recorded conversation with WILLIAMS, who was using WILLIAMS Phone. During the conversation, CW-2 arranged to conduct a crack cocaine transaction with WILLIAMS the following day. WILLIAMS asked, "You still trying to touch down?" CW-2 answered, "We can do that tomorrow." WILLIAMS responded, "Tomorrow decent too . . . Tomorrow's decent too. I'm just going to go ahead and get up early, go to sleep kinda early." CW-2 later stated, "I want to do it 'least by eleven." WILLIAMS responded, "Alrigh.' I should be up by then. So you want the same thing, two sixty-thirds [two 63-gram quantities of crack cocaine]." CW-2 replied, "Yeah." WILLIAMS asked, "You want them in different . . . ones [asking if the two 63-gram quantities of crack cocaine should be packaged separately]." CW-2 answered, "Either way. It don't make no difference." WILLIAMS replied, "Alrigh'. I gotch you . . . I had it [crack cocaine] for you today for you. I just had to go on and pick it up."

23. On January 18, 2012, at approximately 9:42 a.m., CW-2 placed a consensually recorded call to WILLIAMS Phone. The telephone call went unanswered and went to WILLIAMS Phone's automated voice message system. CW-2 left the following message, "Alrigh' Big C, (UI), we gonna do like we did yesterday and miss out. I'm tryin' to take care of some business. Hollar at me player."

24. At approximately 10:43 a.m., CW-2 had a consensually recorded conversation with WILLIAMS, who was using WILLIAMS Phone. During the

13

conversation, WILLIAMS explained that he was just waking up and began to arrange to conduct a crack cocaine transaction later that day with CW-2. WILLIAMS asked, "Um so what is . . . Halsted [crack cocaine] or you want two of them [two 63-gram quantities of crack cocaine]?" CW-2 answered, "Two of them, player. Two of them. I told ya." WILLIAMS responded by asking, "Alright, uh, you got the bread [money for the two 63-gram quantities of crack cocaine] now?" CW-2 answered, "Yeah." WILLIAMS replied, "Alright, uh, let me call Gangster [Blackman]." CW-2 responded, "Yeah." WILLIAMS continued, "'Cause uh, he [Blackman] didn't give it [crack cocaine] to me last night. He told me to wait for your phone call before I pick it [crack cocaine] up . . . I might just come and grab you and we just go to him [Blackman]." CW-2 responded, "Alrigh'."

25.    At approximately 11:30 a.m., CW-2 met with law enforcement agents at a pre-determined location to prepare for the crack cocaine deal with WILLIAMS. At that time, law enforcement agents searched both CW-2 and CW-2's car for money, weapons and contraband, and found none. Law enforcement agents then provided CW-2 with $4,500 in FBI funds to purchase crack cocaine from WILLIAMS. Agents further installed an audio transmitting device in CW-2's car and installed audio and video recording devices on CW-2's person. CW-2 departed the pre-determined location and agents initiated surveillance.

26.    At approximately 11:41 a.m., CW-2 had a consensually recorded conversation with WILLIAMS, who was using WILLIAMS Phone. During the conversation, CW-2 arranged to meet with WILLIAMS to conduct a crack cocaine

transaction later that day. WILLIAMS said, "What's good? Yeah he [Blackman] told me thirty, forty minutes [until WILLIAMS would be able to obtain crack cocaine from Blackman]." CW-2 responded, "Alrigh'. Where you want me to meet 'chu at?" WILLIAMS replied, "Out here towards suburbs. Soon as he [Blackman] I'm going to call you. Um, but you can get off the E-way [expressway] at Maxwells or somethin'." CW-2 asked, "Which Maxwell's?" WILLIAMS answered, "Maxwells right off the E-way on Sibley." CW-2 asked, "That's fifty-seven right [Intersate 57], right?" WILLIAMS answered, "No, oh, you want to meet me off of fifty-seven?" CW-2 responded, "Yeah, that's better." WILLIAMS replied, "Alright. Meet me at that McDonald's off Sibley." CW-2 later stated, "Alrigh."

27. At approximately 11:41 a.m., CW-2 had a recorded conversation with WILLIAMS, who was using WILLIAMS Phone. During the conversation CW-2 further arranged to meet with WILLIAMS to conduct a crack cocaine transaction. WILLIAMS said, "Yeah, I'm in traffic now. He told me he's [Blackman] gonna be, he told me he's gonna be on his way, so. So, shit, I'm just waitin' for him now." CW-2 asked, "You say you in traffic?" WILLIAMS answered, "Yeah . . . I'm bustin' other moves [supplying other crack cocaine customers]. But I'm waiting for him so he can give me that. What you want though 'cause the trap don't got that many . . . don't got that much left. If the trap had that much left I woulda just grabbed it from the trap and came to you." CW-2 responded, "Right . . . I'm gonna be up at the McDonald's waitin' on you." WILLIAMS replied, "I'm in traffic, B. I'm still waitin' for Gangster [Blackman]. You know Gangster, I wouldn't say, don't, I wouldn't tell you to come up there and wait. If you

15

want to you can though. It's up to you." CW-2 said, "Yep." WILLIAMS replied, "Alrigh'."

28.     At approximately 11:47 p.m., surveillance observed CW-2 arrive at the McDonald's restaurant located at 2004 Sibley Boulevard in Calumet City, Illinois. CW-2 parked his/her car in the parking lot.

29.     At approximately 12:11 p.m., CW-2 had a recorded conversation with WILLIAMS, who was using WILLIAMS Phone. During the conversation, WILLIAMS informed CW-2 that WILLIAMS was going to meet with CW-2 at McDonald's. Specifically, WILLIAMS explained, "Yeah B. I'm finnin' to meet you up there now. It's going to take me like five minutes to get there." CW-2 responded, "Alrigh'." WILLIAMS replied, "Alrigh'."

30.     At approximately 12:20 p.m., surveillance at the McDonald's restaurant observed WILLIAMS arrive in a white Ford van bearing Indiana license plate number 34513B. WILLIAMS got out of the drivers' seat of the van and got into the front passenger seat of CW-2's car.

31.     As captured by the recording equipment agents installed on CW-2's person, when WILLIAMS entered CW-2's car, WILLIAMS told CW-2, "We got to go to uh athletes right down the street, that's where we gonna meet out our [UI]." WILLIAMS then got out of CW-2's car, got back into the white van, and drove out of the McDonald's parking lot. CW-2 followed WILLIAMS in CW-2's car.

32.     At approximately 12:30 p.m., surveillance observed WILLIAMS and CW-2 arrived at the Athlete's Foot retail store located at 1111 East Sibley Boulevard in

16

Dolton, Illinois. WILLIAMS got out of the white van and got into the front passenger seat of CW-2's car. While CW-2 and WILLIAMS were sitting in CW-2's car, CW-2 gave WILLIAMS the $4500 in government buy funds. As captured by the recording equipment agents installed on CW-2's person, WILLIAMS can be heard counting the money out loud.

33. At approximately 12:45 p.m., as captured by the recording equipment, WILLIAMS received a telephone call on his cellular telephone. WILLIAMS asked the caller, "Where you at B?" WILLIAMS then explained, "I'm sittin in the car. I'm in the van . . . in the Infiniti (CW-2's car). I said I'm in the van. You'll see it." After WILLIAMS ended the telephone call, he told CW-2, "This [Individual A], it ain't Gangster [Blackman]."

34. At approximately 12:45 p.m., surveillance observed a 2007 black Chevrolet Tahoe bearing Illinois license plate number H320377 arrive in the parking lot.[7] WILLIAMS got out of CW-2's car and got into the front passenger seat of the Tahoe. Shortly thereafter, WILLIAMS got out of the Tahoe and reentered CW-2's car. WILLIAMS told CW-2, "B, he gave me this softball [powder cocaine], so you gonna have to follow me, cause I put my little money with it too, so you gonna have to follow me so we can do the rest of it." CW-2 clarified, "What you mean? You got to cook it [convert the powder cocaine into crack cocaine]?" WILLIAMS indicated that he did, explaining that it would take "ten to fifteen minutes" to cook the powder cocaine into

---

[7] Records from the Illinois Secretary of State's Office demonstrate that this vehicle is registered to Individual A.

17

crack cocaine. CW-2 agreed to WILLIAMS' proposal, "Alright, cool." CW-2 asked WILLIAMS, "He didn't have no hard [crack cocaine], huh?" WILLIAMS answered, "No, no, that's all . . . he dropped off me soft." WILLIAMS then explained, "I'm fittin to stop at Walgreens and grab all my ingredients real quick [to cook the powder cocaine into crack cocaine]." CW-2 agreed, "Aight." WILLIAMS got out of CW-2's car, got back into the white van and drove away from the Athlete's Foot parking lot. CW-2 followed WILLIAMS.

35.    At approximately 12:50 p.m., surveillance observed WILLIAMS arrive in the white van at the Walgreens drug store located at 1150 East Sibley Avenue in Dolton, Illinois. WILLIAMS parked the van and went into the Walgreens. Approximately five minutes later, WILLIAMS came out of the Walgreens carrying several white plastic grocery bags. WILLIAMS got into the white van and drove out of the Walgreens parking lot. CW-2 followed WILLIAMS.

36.    WILLIAMS, with CW-2 following in CW-2's car, drove the white van to an apartment complex located at 7100 Idaho Avenue, Hammond, Indiana, arriving at approximately 1:18 p.m. As captured by the recording equipment agents installed on CW-2's person, WILLIAMS and CW-2 got out of their vehicles and went into a first floor apartment in an apartment building within the complex.

37.    Once WILLIAMS and CW-2 were in the apartment, WILLIAMS took the powder cocaine and cooked it into crack cocaine in the kitchen area of the apartment. Specifically, as captured by the recording equipment agents installed on CW-2's person, WILLIAMS worked with a blender, a small box of Arm & Hammer baking soda and

18

glass container. WILLIAMS placed the glass container on the stove top where he cooked, stirred and blended an off-white substance over an open flame. WILLIAMS next put the glass container in the freezer of a refrigerator in the kitchen. Several minutes later, WILLIAMS took the glass container out of the freezer, added some water to the container, and removed an off-white, solid substance from the container, placing it on a plate. WILLIAMS then put the plate into the freezer. A couple of minutes later, WILLIAMS removed the plate and obtained a box of clear plastic bags. WILLIAMS took chunks of the substance from the plate and appeared to be weighing them. WILLIAMS asked CW-2, "You want 63s [63 gram portions of crack cocaine] in separate bags?" CW-2 responded, "Put it all in one bag." WILLIAMS continued to prepare the suspect crack cocaine, eventually telling CW-2, "Should be 129 [grams]." WILLIAMS further commented, "It still wet."

38.     At approximately 1:40 p.m., CW-2 left the apartment where WILLIAMS had taken CW-2 to cook the powder cocaine into crack cocaine. CW-2 then drove to a pre-determined location to meet with agents. Agents recovered the recording devices installed in CW-2's car and on CW-2's person. Agents also recovered a clear plastic bag containing an off-white, solid substance that WILLIAMS distributed to CW-2. The substance WILLIAMS provided to CW-2 was sent to the DEA Lab, which determined that the substance weighed 122.4 grams and tested positive for cocaine base.

39.     Agents also once again searched CW-2 and CW-2's car for money, weapons or contraband, and found none.

19

## CONCLUSION

40.     Based on the information in this affidavit, there is probable cause to believe that WILLIAMS knowingly and intentionally distributed a controlled substance, namely, 28 grams or more of mixtures and substances containing a detectable amount of cocaine base, a Schedule II Narcotic Drug Controlled Substance, in violation of Title 21, United States Code, Section 841(a)(1).

FURTHER AFFIANT SAYETH NOT.

STEPHEN CUPP
Special Agent, Federal Bureau of Investigation

SUBSCRIBED AND SWORN to before me on April 3, 2013.

Sheila Finnegan
United States Magistrate Judge

20